UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

CURTIS ROY GREEN, SR.,

        Petitioner,                 Case No. 1:08-cv-358

v.                                   Honorable Gordon J. Quist

BLAINE C. LAFLER,

        Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254. Petitioner was convicted in the Kent County Circuit Court of two counts of first-degree

criminal sexual conduct (CSC), MICH. COMP. LAWS § 750.520b(1)(f); and two counts of second-

degree CSC, MICH. COMP. LAWS § 750.520c(1)(f). He was sentenced to concurrent prison terms

of ten to fifty years for each of the CSC I convictions and ten to fifteen years for each of the CSC

II convictions. In his *pro se* petition, Petitioner raises nine grounds for relief, as follows:

    I.      The lack of specificity as to the date of the offenses violates the defendant's
           due process rights, as well as his constitutional right to proper notice of the
           charges against him, and his constitutional right to present a defense.

    II.     Joining all of the charges together violated the defendant's right to a fair trial
           because it violated court rule, case law and the Michigan and United States
           Constitutions.

    III.    The defendant's convictions should be overturned because there was
           insufficient credible evidence at trial to prove the defendant guilty of the
           crimes.

    IV.    The defendant's convictions must be reversed because they are against the
           great weight of the evidence or involve a miscarriage of justice.

V.    The trial court denied the defendant a fair trial by giving prejudicial and incomplete instructions, erring in his evidentiary ruling, failing to give a directed verdict, failing to control the prosecuting attorney, sentencing, [sic] the CSC second convictions above the guidelines, and denying the motion for a new trial.

VI.   The prosecutor's actions denied the defendant a fair trial and his due process rights under the Michigan and Federal Constitutions.

VII.  The Defendant's sentence was invalid because it was based on inaccurate information, i.e., improper scoring of legislatively imposed sentencing guidelines, and use of an incorrect burden of proof; therefore, his due process rights were violated.

VIII. Correctly scoring the guidelines would require the defendant's resentencing.

IX.   The defendant should get a new trial because of ineffective assistance of trial counsel.

(Pet., 6-21, docket #1.)  Respondent has filed an answer to the petition (docket #7) stating that the petition should be denied.  Upon review and applying the AEDPA standards, I find that Petitioner's claims are procedurally defaulted or are without merit.  Accordingly, I recommend that the petition be denied.

**Procedural History**

**A.    Trial Court Proceedings**

Petitioner was accused of sexually assaulting his daughter, Nichole Marie Green.  He was tried before a jury on August 29-September 2, 2005, on two counts each of first-degree CSC, second-degree CSC, third-degree CSC and fourth degree CSC.[1]

_____

[1]The trial transcripts will be referred to as follows:
Trial Transcript Volume I, August 29, 2005 (docket #10)       "Tr., I"
Trial Transcript Volume II, September 1, 2005 (docket #11)    "Tr. II"
Trial Transcript Volume III, September 2, 2005 (docket #12)   "Tr. III"

Nichole Marie Green testified that she graduated from Union High School on May 18, 2005. (Tr. II, 23.) She had lived with her father, the Petitioner, for most of her life. (Tr. II, 25.) They moved to Arkansas when she was five or six and they lived there for about ten years. (Tr. II, 25-26.) Beginning when Nichole was five or six, there were incidents when Petitioner made her pull up her shirt and he would pull down his pants and make her touch his penis. (Tr. II, 26.) Petitioner touched her breasts, butt and private areas. (Tr. II, 27.) The incidents took place in the house or in the car and occurred two or three times a week. (*Id.*) Nichole testified that in December 1998, Petitioner's girlfriend, Tammy, walked in while Petitioner was doing something to her. (Tr. II, 27, 38-39.) Tammy called the police and Nichole was removed from the home. (Tr. II, 27, 39.) Nichole lived in foster care and then with her aunt and uncle for a year or two. (Tr. II, 28, 39.) Nichole then was returned to her father, who had married Tammy and completed some type of treatment program. (Tr. II, 28, 39-40.) After a few months of living with Petitioner, he began engaging her in the same sexual acts. (Tr. II, 29.) He told her that if she told anyone, he would go to prison for a long time. (*Id.*)

Nichole testified that she moved to Grand Rapids on November 21, 2003, with Petitioner and her three brothers. (Tr. II, 29.) They first lived on 7th Street, moved to 11th Street, and then to a residence on Veto Street. (Tr. II, 30.) During that period they lived with Nichole's sister and her husband and family. (*Id.*) Because there were so many people in the house, Petitioner would suggest that he and Nichole go for a car ride and instructed Nichole to bring lotion and a towel. (Tr. II, 30-31.) The lotion helped Petitioner get hard and then he ejaculated into the towel. (Tr. II, 30-31.) Petitioner called the act a "hand job." (Tr. II, 34.) Nichole testified that Petitioner would park on a back street or in a parking lot. (Tr. II, 33.) Nichole recalled one incident that occurred in the parking lot of the Duthler Food Market. When Petitioner was finished, he dropped

the towel in the parking lot and pulled away.  (*Id.*)  A police officer pulled Petitioner over and asked him what he dropped out of the car.  (Tr. II, 33-34.)  Petitioner told the officer that his nephew or cousin, who was into drugs, had borrowed the car that day and Petitioner was concerned that the towel could contain needles or other drug paraphernalia that could be dangerous to his children.  (Tr. II, 34.)  Petitioner offered to go back for the towel, but the officer said that he would get it.  (*Id.*)

Nichole testified that there also were incidents on Veto Street when Petitioner got on top of her and tried to put his penis in her vagina.  (Tr. II, 31.)  Petitioner would start to take her clothes off or ask her to take her clothes off, tell her get on the bed and then get on top of her.  (Tr. II, 33.)  He put his penis inside her and moved up and down.  (*Id.*)  When that occurred, Nichole tensed up and asked him to stop.  (Tr. II, 31.)  Sometimes Petitioner stopped, but he usually just told her to stop whining.  (Tr. II, 31-32.)  He ejaculated on her back or on a towel that was draped over her back.  (Tr. II, 32.)  The incidents on Veto Street occurred two or three times a week.  (Tr. II, 45.)  Eight to ten people lived in the house.  Nichole shared a room with her cousin, Christina, and Petitioner shared a room with her brothers.  (Tr. II, 42-43.)  Nichole specifically recalled an incident on January 17 that occurred when other people were home.  (Tr. II, 45.)  Nichole wanted to go over to her boyfriend's house and Petitioner would not allow her to go unless she gave him a hand job.  (Tr. II, 53.)  Petitioner told her to lock the bedroom door and told her that he would let her stay out an extra hour if she complied.  (*Id.*)

Nichole testified that as a result of the sexual abuse, she stayed in her room a lot and did not want to go out.  (Tr. II, 34-35.)  She did not want to be around boys by herself and could not date anyone.  (Tr. II, 35.)  Nichole testified that she cried herself to sleep a lot.  (*Id.*)  She testified

that Petitioner bought her a car and other small gifts so that she would not tell anyone what he was doing.  (Tr. II, 37.)

When Nichole was in high school, she began dating Jackson Leo.  (Tr. II, 47.)  He moved in with her family and was permitted to sleep in Nichole's bed as long as the bedroom door was open.  (Tr. II, 48.)  While she was in high school, Nichole finally realized that what her father was doing to her was wrong.  (Tr. II, 35, 37.)  Jackson's parents became Nichole's foster parents and she still lived with them after she turned eighteen.  (Tr. II, 49.)  At the time of trial, Nichole was seeing a therapist to help deal with what her father did to her.  (Tr. II, 35.)  She continued to have bad dreams and could not watch television or movies that dealt with issues of incest.  (Tr. II, 36.)

Grand Rapids Police Officer John Purlee testified that on the night of April 1, 2004, he was watching the parking lot at the Duthler Food store near the corner of Bridge Street and Gold Avenue.  (Tr. II, 57-58.)  At about 10:16 p.m., he saw a teal green Pontiac Grand Prix pull into the lot.  (Tr. II, 58-60.)  A white teenage woman got out of the car and tugged on the door of the store. The store was closed and the door was locked.  (Tr. II, 57-58.)  Purlee testified that the car was in the lot for a minute or less.  (Tr. II, 64.)  Before the car left the parking lot, the man in the driver's seat opened his door and threw a towel on the ground.  (Tr. II, 60.)  Purlee pursued the car and stopped it for littering.  He issued a ticket to Curtis Roy Green.  (*Id.*)  Purlee went back to the parking lot and threw the towel in the dumpster.  (Tr., 61.)  He did not notice anything suspicious going on in the car.  (Tr. II, 64.)  Purlee went to Petitioner's house on Veto Street the next day because he had erroneously written a ticket for an infraction when littering actually was a misdemeanor.  (Tr. II, 62.)

Grand Rapids Police Detective Daniel Adams testified that he interviewed Nichole at the Children's Assessment Center. (Tr. II, 69.) Crystal Burnett, a Child Protective Services (CPS) worker, also was present during the interview. (Tr. II, 70.) Nichole made disclosures during the interview, including incidents that occurred in Arkansas and an incident that involved a towel being thrown out at Duthler Foods. (*Id.*) Burnett received a copy of the CPS report from Arkansas. Adams was unable to obtain a police report from Arkansas because it had been destroyed. (Tr. II, 72.) Adams was able to locate the 2004 littering citation issued to Petitioner. (Tr. II, 71.)

Crystal Burnett testified that she first had contact with Nichole on March 5, after a call came in to CPS. (Tr. II, 83.) After a short preliminary interview with Nichole, Burnett referred the case to the Grand Rapids Police Department. (Tr. II, 84.) Burnett and Detective Adams conducted a full interview with Nichole during which she made allegations about events that occurred in Arkansas. (Tr. II, 84-85.) Burnett received a copy of the CPS file from Arkansas. (Tr. II, 86.) Nichole, who was close to her eighteenth birthday, was placed with the Leo family with the consent of her parents. (Tr. II, 86, 90.) Burnett was informed that Nichole and Jackson Leo had a previous dating relationship. (Tr. II, 88.) They discussed that Nichole and Jackson needed to maintain separate sleeping quarters. (*Id.*) At the time of trial, Nichole was 18 years old and no longer in foster care. (Tr. II, 87.) The prosecution rested at the conclusion of Burnett's testimony.

The defense first called Jean Potts, Nichole's sister and Petitioner's daughter. Potts testified that her father, Nichole and brothers moved into her residence on 7th Street in November 2003. (Tr. II, 96.) Potts, her husband, their two children, her sister, her brothers, her dad, her brother's girlfriend and her dad's girlfriend were living together in the three-bedroom home. (Tr II, 96-97.) Potts had a bedroom, her children had a bedroom, and for the most part the rest of the

group slept in the living room. (Tr. II, 97.) Nichole sometimes slept in the bedroom with Potts' children. (Tr. II, 97, 101.) Petitioner slept on the living room couch. (Tr. II, 100-101.) At that time, Potts was a stay-at-home mother and was expecting a third child. (Tr II, 97-98.) Potts never saw incidents of her father and sister going off to a room by themselves. (Tr. II, 98.) Potts testified that Petitioner and Nichole went out alone for a car ride once in a while, but more people usually went on the outings. (*Id.*) Potts could not recall who initiated the outings and did not see Nichole take anything with her. (Tr. II 99.) According to Potts, Nichole always was happy; she never saw Nichole cry, exhibit abnormal behavior or display negative feelings toward Petitioner. (Tr. II, 102-103.)

Potts testified that the family moved from 7th Street to 11th Street in February. (Tr. II, 103.) Her father and siblings only lived with her for another month after the move to 11th Street. (*Id.*) When they moved to Veto Street, Nichole did not ask to stay with Potts. (Tr. II, 104.) Potts recalled that Nichole was dating a boy named "Nathan" when she moved to Michigan from Arkansas. Sometime after Nichole moved out of Potts' house, she dated Rob Norman. (*Id.*) On cross-examination, Potts acknowledged that some of Nichole's family members, including Potts, did not like that fact that Nichole was making these accusations against her father. (Tr. II, 105-106.) With regard to what had occurred in Arkansas, Potts testified that she was not aware that Petitioner made a statement in the course of the CPS investigation admitting that he was masturbating in Nichole's bedroom and alleging that he tripped over a chair and ended up on top of her. (Tr. II, 111.)

Amanda Green testified that she was married to Petitioner's son, Woodrow Green. At the time of the alleged offenses, Amanda and Green were still dating. (Tr. II, 113.) Woodrow,

- 7 -

who was in the Army, came home from Iraq for a mid-tour break in late November 2003, while Petitioner and Nichole were living on 7th Street. (Tr. II, 113-14.) Green was at the 7th Street residence for much of Woodrow's two-week break and then began staying there every night in December when she moved out of her apartment. (Tr. II, 115.) Amanda slept at one end of a sectional couch and Petitioner slept on the other end. (Tr. II, 116.) Jean Potts and her husband used the upstairs bedroom and Potts' three children used the two downstairs bedrooms. Nichole and her brothers slept in their cousin's bedrooms or on the floor in the living room. (*Id.*) At that time, Amanda worked as a cocktail waitress at Sensations from 7:00 or 9:00 p.m. until 2:30 a.m. (Tr. II, 117, 124, 126.) Amanda testified that she was home in the afternoon and early evenings after Nichole came home from school. (Tr. II, 117.) According to Amanda, Nichole was a normal teenager and was in a good mood most of the time. (*Id.*) Amanda described Nichole as a "daddy's girl" and said that she always was sitting by him and talking to him. (Tr. II, 117-18.) Amanda recalled occasions when Nichole would volunteer to go to the store with Petitioner. (Tr. II, 118-19.) Amanda never observed Nichole being withdrawn from Petitioner or noticed any behavior between Petitioner and Nichole that caused her concern. (Tr. II, 119, 120.)

On cross-examination, Amanda testified that at the same time she was dating Woodrow, Amanda's mother was dating Petitioner. (Tr. II, 123.) At one point her mother also was living at the 7th Street residence. (Tr. II, 127.) Amanda agreed that Nichole's accusations against her father caused her siblings to be upset with her. (Tr. II, 126.) With regard to what had occurred in Arkansas, Amanda testified that she was not aware that Petitioner had admitted to masturbating in Nichole's bedroom and stated that he tripped over a chair and ended up on top of her. (Tr. II, 111.)

Jennifer Derby, Petitioner's niece, testified that Petitioner, Nichole and her brothers came to live with Derby's family on Veto Street from July 5, 2004 to January 26, 2005. (Tr. III, 132, 144.) Derby's husband and three daughters also lived in the home. (Tr. III, 132.) The families lived together for about six months. (Tr. II, 145.) Derby and her husband shared one of the downstairs bedrooms, Petitioner and his eldest son, C.J., shared the other downstairs bedroom and the rest of the children shared the three upstairs bedrooms. Nichole shared a bedroom with Derby's oldest daughter. (Tr. III, 133.) Petitioner was unemployed for a couple of weeks after they moved in, but got a job with Detroit Truck Services. (Tr. III, 134-35.) After a few weeks of employment, Petitioner was assigned to work in Detroit. He left every week on Sunday night or Monday morning and did not return from Detroit until Friday evening. (*Id.*) Derby was a stay-at-home mother and watched Petitioner's children when he was out of town. (Tr. III, 136.) Derby did not notice any change in Nichole's behavior when her father was about to come home. (Tr. III, 137.) Derby testified that Petitioner only closed his bedroom door if he was changing clothes or sleeping. She never saw Petitioner and Nichole alone in his bedroom. (Tr. II, 138.) Derby could recall only two or three instances when Petitioner and Nichole went alone for a car ride, and that was when Petitioner gave Nichole a ride to work. (Tr. II, 139.)

Derby testified that she was concerned when she saw condoms in Nichole's purse; however, the trial court immediately instructed the jury to disregard that statement. (Tr. II, 142-53.) Derby testified that Nichole dated Rob Norman and Jackson Leo, and had other male friends that came to the house. (Tr. II, 143-44, 149.) On cross-examination, Derby testified that she heard rumors about what had happened in Arkansas, but did not think it was any of her business. (Tr. II,

146-47.) She did not know that Petitioner admitted to masturbating in Nichole's bedroom and stated that he tripped over a chair and fell on top of her.  (Tr. II, 146.)

At the conclusion of trial, on September 2, 2005, the jury found Petitioner guilty on all eight counts of CSC.  (Tr. II, 5, docket #12.)  At the sentencing hearing held on October 24, 2005, the trial court vacated the third-degree and fourth-degree CSC convictions as being duplicative in nature based on proofs at trial.  (Sentencing Transcript, (S. Tr.), 4, docket #13.)  The trial court sentenced Petitioner to concurrent prison terms of fifteen to fifty years for each of the CSC I convictions and ten to fifteen years for each of the CSC II convictions.  (S. Tr., 8-9.)

## B.      Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on October 3, 2006, raised the same nine issues as raised in this application for habeas corpus relief.  (See Def.-Appellant's Br. on Appeal, docket #14.)  By unpublished opinion issued on June 14, 2007, the Michigan Court of Appeals affirmed Petitioner's convictions, but remanded his case for re-sentencing and correction of the judgment of sentence.  (See 6/14/07 Mich. Ct. App. Opinion ("MCOA Op."), docket #14.)  The court of appeals found that Petitioner was entitled to re-sentencing because his sentence was predicated upon an inaccurate calculation of the guideline range.  At a re-sentencing hearing on August 20, 2007, the trial court sentenced Petitioner to concurrent prison terms of ten to fifteen years for the two first-degree CSC convictions and ten to fifteen years for the two second-degree CSC convictions.

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same nine claims raised before and rejected by the Michigan Court of Appeals.  By order entered October 29, 2007, the Michigan Supreme Court denied his application

for leave to appeal because it was not persuaded that the questions presented should be reviewed. (See 10/29/07 Mich. Ord., docket #15.)

**Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

**<u>Discussion</u>**

A.    **Ground I:  Prosecutor's Failure to Allege Specific Dates for the Charged Offenses**

In his first ground for habeas corpus relief, Petitioner contends that the lack of specificity as to the dates of the offenses violated his rights to procedural due process, to notice of the charges against him and to present a defense.   According to the amended information, the offenses occurred sometime during the period from November 21, 2003 to September 30, 2004.  The Michigan Court of Appeals found that the issue was waived by defense counsel's failure to make an objection, but nonetheless found that the information was sufficient to notify Petitioner of the charges against him:

> Defendant contends that the prosecutor's failure to allege specific dates for the charged offenses deprived him of due process of law and of his right to present a defense. The original felony information alleged that the charged offenses occurred in Kent County "on or about 04/01/2004 to 09/30/2004." Defendant failed to object to the information before trial as required by MCL 767.76. At trial, the parties agreed to amend the information to provide that the charged offenses occurred in Kent County "between November 21, 2003, and September 30, 2004." A defendant may not assign error on appeal to something his own counsel deemed appropriate at trial. *People v Green*, 228 Mich App 684, 691; 580 NW2d 444 (1998). "To do so would allow defendant to harbor error as an appellate parachute." *Id.* Because defense counsel expressed satisfaction with this change, defendant has waived this issue on appeal. *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000).

> Nonetheless, we find that the information was sufficient to apprise defendant of the nature and severity of the charges against him. *People v Darden*, 230 Mich App 597, 601-602; 585 NW2d 27 (1998). The evidence demonstrated that the prosecutor identified the date of the offenses to the best of his knowledge after undertaking a reasonably thorough investigation. The victim testified that defendant had been sexually abusing her since she was approximately five years old. "Thus, it is conceivable that specific dates would not stick out in her mind." *People v Naugle*, 152 Mich App 227, 235; 393 NW2d 592 (1986). Moreover, the prosecutor need only state the time of an offense "as near as may be." MCL 767.45(1)(b). Finally, in the context of this case, the actual date of the offenses was not essential to the crimes alleged. *See Naugle, supra* at 235.

(MCOA Op. 1-2.)

Respondent contends that Petitioner's claim is procedurally defaulted because it was deemed waived by the Michigan Court of Appeals. When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence,

- 14 -

it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim. It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial. *See, e.g.*, *People v. Kelly*, 423 Mich. 261, 271 (1985). A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee*, 534 U.S. at 385. Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court. *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996). The court of appeals' subsequent review of the issue did not waive the procedural default because it was a separate and alternative holding apart from the determination of the procedural default. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991); *Paprocki v. Foltz*, 869 F.2d 281, 285 (6th Cir. 1989). Accordingly, review by this court is barred unless Petitioner can show cause and prejudice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray*, 477 U.S. at 485.

To show cause sufficient to excuse a failure to raise claims on direct appeal, Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal. *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991). Petitioner claims in his ninth ground for habeas corpus relief, that his trial counsel was ineffective for failing to challenge the lack of specificity regarding the dates of the alleged offenses. In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-

prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

The Michigan Court of Appeals summarily rejected Petitioner's claims of ineffective assistance of counsel "because defendant has not established that trial errors occurred, or because the alleged errors were not outcome determinative." (See MCOA Op. 10.) I find that trial counsel's failure to challenge the lack of specificity regarding the dates of the alleged offenses was not unreasonable because the information provided was constitutionally sufficient notice of the charges. Due process mandates that criminal charges give a defendant adequate notice of the charges in order to enable him to mount a defense. *See Russell v. United States*, 396 U.S. 749, 763-64 (1962). However, the Sixth Circuit and numerous others have found that fairly large time windows in the context of child abuse prosecutions are not in conflict with constitutional notice requirements. *See*

*Valentine v. Konteh*, 395 F.3d 626, 632 (6th Cir. 2005) (10 months); *Isaac v. Grider*, No. 98-6376, 2000 WL 571959, at *5 (6th Cir. May 4, 2000) (four months); *Madden v. Tate*, No. 85-3061, 1987 WL 44909, at *1-3 (6th Cir. Sept. 30, 1987) (six months); *see also Fawcett v. Bablitch*, 962 F.2d 617, 618-19 (7th Cir. 1992) (six months); *Hunter v. New Mexico*, 916 F.2d 595, 600 (10th Cir. 1990) (three years); *Parks v. Hargett*, No. 98-7068, 1999 WL 157431, at *4 (10th Cir. 1999) (seventeen months). Consequently, the ten to eleven-month time window for the offenses charged in this case did not offend the notice requirement.

Because counsel's performance was not ineffective, Petitioner cannot show cause for his default. Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985). Regardless, Petitioner cannot show prejudice for his default. Prejudice requires the Petitioner to show that the alleged error "worked to his *actual* and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). "'[T]he prejudice component of the cause and prejudice test is not satisfied if there is strong evidence of Petitioner's guilt and a lack of evidence to support his claim.'" *Perkins*, 58 F.3d at 219 (quoting *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994)). Petitioner cannot show prejudice because, as stated above, he received constitutionally sufficient notice of the charges against him.

Petitioner also has not demonstrated that manifest injustice would result because he has not made a colorable claim of innocence; he has not shown that any constitutional error "probably" resulted in the conviction of one who was actually innocent. *Schlup v. Delo*, 513 U.S. 298, 322 (1995) (citing *Murray*, 477 U.S. at 495). This requires a showing "that 'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable

doubt.'" *Coleman*, 244 F.3d at 540 (quoting *Schlup*, 513 U.S. at 329). Petitioner has failed to present any new evidence to support a claim of innocence. Accordingly, I conclude that Petitioner's claim is procedurally defaulted and may not be reviewed by the Court.

### B. Ground II: Trial Court's Failure to Sever the Charges

In Ground II, Petitioner claims that joining all of the charges against him violated Michigan law and his federal constitutional rights to a fair trial. He asserts that he was entitled to be tried separately on each CSC charge that he faced. The Michigan Court of Appeals found that the issue was unpreserved for appellate review, but found no plain error:

> Defendant also contends that the trial court erred in failing to sever the charged offenses for trial. Defendant did not object to the joinder of the offenses. Therefore, this issue is unpreserved. *Green, supra* at 690-691. We review unpreserved issues for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Defendant has the burden of establishing that he was prejudiced by the error, i.e., that the error affected the outcome of the lower court proceedings. *Id.* Reversal is warranted only if the plain error resulted in the conviction of an innocent defendant or affected the fairness, integrity or public reputation of the judicial proceedings. *Id.*

> Contrary to defendant's assertion, the trial court was not required to sever the offenses on its own initiative. MCR 6.120(B) provides that, "[o]n its own initiative, . . . the court may . . . sever offenses charged in a single information" (emphasis added). The court rule's use of the word "may" indicates that it is discretionary. *People v Brown*, 249 Mich App 382, 386; 642 NW2d 382 (2002). While a trial court may sever related offenses in certain circumstances, it is not required to do so. *People v Duranseau*, 221 Mich App 204, 208; 561 NW2d 111 (1997). Here, joinder was appropriate because the charged offenses were based on a series of acts constituting parts of defendant's scheme or plan to engage in sexual activity with the victim whenever the opportunity arose. MCR 6.120(B)(1)(c); *People v Miller*, 165 Mich App 32, 45; 418 NW2d 668 (1987). "[J]oinder is allowed for offenses which are part of a single scheme, even if considerable time passes between them." *People v Tobey*, 401 Mich 141, 152 n 15; 257 NW2d 537 (1977).

> Moreover, defendant failed to establish that a different outcome was likely had the charges been severed and separate trials held. We note that if separate trials were held in this case, evidence of other charges would have been admissible in each of the separate trials to prove a relevant proper purpose. MRE 404(b); *People v VanderVliet*, 444 Mich 52, 74; 508 NW2d 114 (1993). Because the evidence

pertaining to the other charges, which defendant believes caused him prejudice, would have been admissible in each of the trials, defendant failed to establish that he was prejudiced by the trial court's failure to sever the offenses. *See People v Girard*, 269 Mich App 15, 18; 709 NW2d 229 (2005); *Duranseau, supra* at 208.

(MCOA Op. 2.)

Respondent contends that the issue is procedurally defaulted because it was unpreserved in the trial court. For the same reasons discussed above with regard to Ground I, Petitioner procedurally defaulted his claim by failing to make an objection in the trial court. When a petitioner has procedurally defaulted in the state courts, the federal habeas court will only entertain the defaulted issue if the petitioner can show cause and prejudice. *See House*, 547 U.S. at 536; *Murray*, 477 U.S. at 495; *Hicks*, 377 F.3d at 551-52. In Ground IX, Petitioner asserts that his trial counsel was ineffective for failing to move for separate trials on each of the CSC charges. Applying *Strickland*, counsel's failure to request a separate trial for each charge against Petitioner was not objectively unreasonable. As discussed by the court of appeals, having separate trials would have been futile because, under Michigan law, evidence of the other charged offenses would have been admissible in each of the separate trials as evidence of a common scheme or plan. *See* MICH. CT. R. 6.120(B)(1)(c); M.R.E. 404(b). Failing to make a futile motion is neither unreasonable nor prejudicial. *See Jacobs v. Sherman*, 301 F. App'x 463, 470 (6th Cir. 2008). Therefore, Petitioner's claim of ineffective assistance is without merit and cannot serve as cause for his default.

While the Court need not consider whether Petitioner has established prejudice, *see Engle*, 456 U.S. at 134 n.43, Petitioner clearly was not prejudiced by the trial court's failure to sever the charges for the reasons previously stated. Moreover, because evidence of the other charged offenses would have been admissible in separate trials, Petitioner cannot show that he was

prejudiced by being tried on all of the charges at the same time.  Accordingly, Petitioner's claim is procedurally defaulted and may not be reviewed by the Court.

> C.    **Grounds III and IV: Insufficient Evidence/Verdict Against the Great Weight of the Evidence**

In his third ground for habeas corpus relief, Petitioner claims that there was insufficient evidence to support his CSC convictions.  Specifically, Petitioner argues that the victim's testimony was not credible and that there was no evidence of force or coercion.  Petitioner further argues in Ground IV that his convictions were against the great weight of the evidence.

> 1.    Sufficiency of the evidence

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Id.*  Issues of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993).  Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law.  *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

After a thorough analysis, the Michigan Court of Appeals rejected Petitioner's claim of insufficient evidence:

To sustain defendant's CSC-I convictions, the prosecution was required to prove beyond a reasonable doubt that (1) defendant engaged in sexual penetration on two instances, (2) that defendant used force or coercion to accomplish the penetrations, and (3) that defendant caused personal injury to the victim. MCL 750.520b(1)(f). Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that the prosecution proved all the essential elements of CSC-I beyond a reasonable doubt.

"Sexual penetration" includes "any . . . intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body." MCL 750.520a(o). The victim's testimony that defendant got on top of her and put his penis inside of her vagina two or three times per week was sufficient evidence from which a jury could infer that two instances of sexual penetration occurred in this case. *People v Robideau*, 94 Mich App 663, 674; 289 NW2d 846 (1980).

"Force or coercion is not limited to physical violence but is instead determined in light of all the circumstances." *People v Reid*, 233 Mich App 457, 468; 592 NW2d 767 (1999). See MCL 750.520b(1)(f). "[A] defendant's conduct constitutes coercion where . . . the defendant abuses his position of authority to constrain a vulnerable victim by subjugation to submit to sexual conduct." *People v Knapp*, 244 Mich App 361, 369; 624 NW2d 227 (2001). The victim testified that before defendant engaged in sex with her, he would ask her to take her clothes off, or he would take her clothes off himself. He asked her not to tell anyone about the sexual abuse and told her that if she did, he would go to prison for a long time. He purchased a car and other items for her so that she would cooperate with him and not report his actions. The victim's testimony was sufficient to prove that defendant used coercion to accomplish the sexual penetration through the abuse of his position of authority, i.e., his position as her father. Furthermore, the evidence was sufficient to prove beyond a reasonable doubt that defendant forced himself upon the victim, without regard to her wishes, where her lack of consent was clear and she was isolated from help. *People v Kline*, 197 Mich App 165, 167; 494 NW2d 756 (1992).

"Personal injury" means "bodily injury, disfigurement, mental anguish, chronic pain, pregnancy, disease, or loss or impairment of a sexual or reproductive organ." MCL 750.520a(m). To prove mental anguish, "the prosecution is required to produce evidence from which a rational trier of fact could conclude, beyond a reasonable doubt, that the victim experienced extreme or excruciating pain, distress, or suffering of the mind." *People v Petrella*, 424 Mich 221, 259; 380 NW2d 11 (1985). "The record must contain either direct evidence of intensified mental suffering, such as specific testimony on the point from the victim, or perhaps circumstantial evidence of such suffering, as an inference properly to be drawn from other facts in the record." *Id.* at 275. But the evidence of mental anguish need not be overwhelming. *People v Himmelein*, 177 Mich App 365, 377; 442 NW2d 667

(1989). The victim testified that although the sexual abuse began when she was five or six years old, she was too afraid to report the abuse until she was in high school. At the time of trial, she was attending counseling sessions, and she felt angry and humiliated about what defendant did to her. She also testified that as a result of defendant's actions, she stayed in her room a lot, "didn't want to be around any guys by [her]self," and frequently cried herself to sleep. Further, trial testimony established that the victim became alienated from her entire family after she made the allegations of sexual abuse against defendant. Viewing the evidence in the light most favorable to the prosecution, the victim's testimony was sufficient evidence from which the jury could have concluded beyond a reasonable doubt that the victim experienced extreme distress or suffering of the mind.

To sustain defendant's CSC-II convictions, the prosecutor was required to prove beyond a reasonable doubt that (1) defendant engaged in sexual contact with the victim on two instances, (2) that defendant used force or coercion to accomplish the sexual contact, and (3) that defendant caused personal injury to the victim. MCL 750.520c(1)(f). Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that the prosecution proved all the essential elements of CSC-II beyond a reasonable doubt.

"Sexual contact" includes "the intentional touching of the victim's or actor's intimate parts or the intentional touching of the clothing covering the immediate area of the victim's or actor's intimate parts, if that intentional touching can reasonably be construed as being for the purpose of sexual arousal or gratification." MCL 750.520a(n). The victim's testimony is sufficient evidence from which a jury could infer that two instances of sexual contact occurred in defendant's car, where she masturbated defendant's penis with her hand. *See People v Alter*, 255 Mich App 194, 202-203; 659 NW2d 667 (2003).

The victim also testified that defendant referred to the sexual acts as "helping him." On one occasion, he locked the bedroom door and told her "the only way [she] could go to [her] boyfriend's house [was] if she 'helped' him." She complied, so he allowed her to stay at her boyfriend's house for one extra hour. Defendant asked her not to tell anyone about the sexual contact and told her that if she did, he would go to prison for a long time. He also purchased a car and other items for her so that she would cooperate with him and not tell anyone about his actions. Defendant's conduct constituted coercion. He abused his position of authority "to constrain a vulnerable victim by subjugation to submit to sexual conduct." *Knapp*, *supra* at 369. Moreover, nothing indicates that the victim gave defendant permission to have sexual contact with her, and the sexual contact occurred in the car where the victim was isolated from help. Under these circumstances, viewing the evidence in a light most favorable to the prosecution, the evidence was sufficient for a rational trier of fact to find that defendant used force or coercion to accomplish the sexual contact.

Finally, as discussed above, the prosecutor presented sufficient evidence from which the jury could have concluded beyond a reasonable doubt that defendant caused the victim to suffer mental anguish.

In arguing to the contrary, defendant contends that the victim's testimony was not credible, so the evidence was not sufficient to support his convictions. First, the prosecutor was not required to corroborate the victim's testimony. MCL 750.520h. "A complainant's eyewitness testimony, if believed by the trier of fact, is sufficient evidence to convict." *People v Newby*, 66 Mich App 400, 405; 239 NW2d 387 (1976). Second, in determining whether sufficient evidence has been presented, we will not interfere with the trier of fact's role in determining the weight of the evidence or the credibility of witnesses. *People v Williams*, 268 Mich App 416, 419; 707 NW2d 624 (2005). We must resolve all conflicts in the evidence in favor of the prosecution. *Nowack, supra* at 400.

(MCOA Op. 3-5.)

In his habeas petition, Petitioner continues to argue that the victim's testimony was not credible because it was vague, uncorroborated, inconsistent and contradicted by the testimony of other witnesses. When reviewing the sufficiency of the evidence, a habeas court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for the jury. *See United States v. Jackson*, 55 F.3d 1219, 1225 (6th Cir. 1995). Moreover, as discussed by the Michigan Court of Appeals, it is well-established that the testimony of the victim standing alone is sufficient evidence to convict a defendant beyond a reasonable doubt. *See, e.g., United States v. Mejia*, 909 F.2d 242, 245 (7th Cir. 1990); *Swaizey v. Davis*, No. 07-11776, 2009 WL 68652, at *8 (E.D. Mich. Jan. 9, 2009). This conclusion is not altered by the fact that there was no physical evidence to corroborate the victim's testimony. *See United States v. Howard*, 218 F.3d 556, 565 (6th Cir. 2000); *Peters v. Whitley*, 942 F.2d 937, 941-42 (5th Cir. 1991). Nor is this conclusion altered by the fact that Petitioner's counsel attacked the victim's credibility and her version of events. "Even in the face of inconsistent evidence, a victim's testimony alone can be sufficient to support a guilty verdict." *United States v. Kenyon*, 397 F.3d 1071, 1076 (8th Cir. 2005). Credibility

determinations are the province of the trier of fact, and the jury was free to credit the victim's testimony and discredit the testimony of other witnesses, despite any weaknesses or inconsistencies in the victim's testimony. *See Deel v. Jago*, 967 F.2d 1079, 1086 (6th Cir. 1992); *see also Tyler v. Mitchell*, 416 F.3d 500, 505 (6th Cir. 2005) ("Tyler's insufficient evidence argument rests on an allegation involving witness credibility, which is clearly the province of the jury and not this court."); *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002) (noting that attacks on witness credibility constitute a challenge to the quality, but not the sufficiency, of the government's evidence). It is the job of the jury, not this Court sitting on habeas review, to resolve conflicts in the evidence, and this Court must presume that the jury resolved those conflicts in favor of the prosecution. *See Jackson*, 443 U.S. at 326.

Petitioner also contends that there was no evidence that he used force or coercion to engage in sexual acts with the victim. As discussed at length by the Michigan Court of Appeals, force or coercion is not limited to physical violence. Under Michigan law, a defendant's conduct constitutes "coercion" for purposes of first and second-degree CSC where the defendant abuses his position of authority to constrain a vulnerable victim by subjugation to submit to sexual contact. *People v. Knapp*, 625 N.W.2d 227, 235 (Mich. Ct. App. 2001). As cited by the Michigan Court of Appeals, the prosecutor presented ample evidence that Petitioner used his position of authority as the victim's father to accomplish the sexual contact or penetration. For example, Nichole testified that Petitioner instigated car rides with her and told her to bring lotion and a towel so she could give him a "hand job." (Tr. II, 30-34.) On occasions when they engaged in sexual intercourse, Nichole testified that Petitioner would start to take her clothes off or ask her take her clothes off. (Tr. II, 31.) He would have her get in bed and then get on top of her. (Tr. II, 33.) When that occurred, Nichole tensed up and asked him to stop, but he usually just told her to stop whining. (Tr. II, 31-32.) On one

occasion when Nichole wanted to go over to her boyfriend's house, Petitioner would not allow her

to go unless she gave him a hand job. (Tr. II, 53.) Petitioner also told Nichole that if she told

anyone, he would go to jail for a long time. (Tr. II, 29.) In addition, Nichole testified that Petitioner

purchased her a car and other gifts so she would not tell anyone what he was doing. (Tr. II, 37.) In

light of the evidence that Petitioner used his position of authority to coerce Nichole to engage in

sexual acts, the decision of the Michigan Court of Appeals is not an unreasonable application of

*Jackson.*

### 2. Verdict against the great weight of the evidence

Petitioner's argument that his verdict was against the great weight of the evidence

parallels his argument regarding the sufficiency of the evidence and also was rejected by the state

court. Under Michigan law, "[t]he test to determine whether a verdict is against the great weight

of the evidence is whether the evidence preponderates so heavily against the verdict that it would

be a miscarriage of justice to allow the verdict to stand." *People v Musser*, 673 N.W.2d 800, 803

(Mich. Ct. App. 2003). In rejecting Petitioner's claim, the Michigan Court of Appeals explained:

> "Conflicting testimony, even when impeached to some extent, is an insufficient
> ground for granting a new trial." *People v Lemmon*, 456 Mich 625, 647; 576 NW2d
> 129 (1998). Here, although defendant elicited testimony from some witnesses that
> was inconsistent with the victim's testimony, we cannot say that the victim's
> testimony was impeached to the extent that it was deprived of all probative value or
> that it was contradicted by indisputable physical facts. *Id.* at 646. Defendant failed
> to "establish that an innocent person had been found guilty, or that the evidence
> preponderates heavily against the verdict so that it would be a miscarriage of justice
> to permit the verdict to stand." *Id.* at 647. Thus, the trial court did not err in denying
> his motion for a new trial.

(MCOA Op. 5.)

Petitioner's claim does not raise a federal issue cognizable on habeas review.

Federal habeas review is limited to deciding whether a conviction violated the Constitution, laws,

or treaties of the United States. *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). "[F]ederal habeas corpus relief does not lie for errors of State law." *Id.* at 67 (*quoting Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). The contention that a verdict is against the great weight of the evidence is a state-law argument directed to a defendant's right to a new trial. *See People v. Herbert*, 511 N.W.2d 654, 658 (Mich. 1993). In contrast to the *Jackson* standard used to assess the sufficiency of the evidence, the state court's inquiry on a motion for a new trial allows the trial judge to assess the credibility of witnesses and to make a discretionary judgment concerning whether the verdict is against the great weight of the evidence. *Herbert*, 511 N.W.2d at 658-59. The Michigan Supreme Court has noted that the grant of a new trial under these circumstances is distinct from the due process issues raised by insufficient evidence, and "does not implicate issues of a constitutional magnitude." *People v. Lemmon*, 576 N.W.2d 129, 133 n.8 (Mich. 1998). Consequently, a state prisoner's claim that the jury verdict was against the great weight of the evidence is a state law claim not cognizable on federal habeas review. *See Young v. Kemp*, 760 F.2d 1097, 1105 (11th Cir. 1985) ("[a] federal habeas court has no power to grant habeas corpus relief because it finds that the state conviction is against the 'weight' of the evidence"); *Cukaj v. Warren*, 305 F. Supp.2d 789, 796 (E.D. Mich. 2004) (federal courts have "no power to grant habeas relief on a claim that a state conviction is against the great weight of the evidence"). The appropriate inquiry for purposes of federal habeas corpus is not whether the verdict was against the great weight of the evidence, but whether sufficient evidence was presented to support the conviction. I concluded above that there was sufficient evidence to support Petitioner's convictions under the *Jackson* standard.

3. <u>Ineffective assistance of counsel</u>

Petitioner further claims that his trial counsel was ineffective for failing to move for a directed verdict due to lack of evidence. Because there was sufficient evidence to sustain Petitioner's conviction, any attempt by trial counsel to move for a directed verdict would have been rejected by the trial court. Counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. *See Chegwidden v. Kapture*, 92 Fed. Appx. 309, 311 (6th Cir. 2004); *A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir.1990); *United States v. Wright*, 573 F.2d 681, 684 (1st Cir. 1978). Accordingly, Petitioner's claim of ineffective assistance is without merit.

D. **Ground V:  Trial Court Errors**

In Ground V, Petitioner claims that he was denied a fair trial due to trial court errors.[2] Respondent contends that Petitioner's claims of trial court error are procedurally defaulted due to Petitioner's failure to make objections at trial. Federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)). *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the

---

[2]While seven instances of trial court error were included in Petitioner's statement of questions presented and supporting brief, the Michigan Court of Appeals specifically addressed only the first three claims.

State.").  Because Petitioner's claims of trial court error are without merit, the Court will assume

without deciding that there was no procedural default or that Petitioner could show cause and

prejudice for that default.  *See Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001), *rev'd on other*

*grounds*, *Bell v. Cone*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).


      1.      <u>Admission of evidence concerning alleged sexual abuse in Arkansas and Barry County, Michigan</u>

Petitioner claims that the trial court erred by allowing admission of evidence

concerning the incidents that allegedly took place in Arkansas and Petitioner's statement in the

Arkansas case that he masturbated in the victim's bedroom.  He further claims that the trial court

erred by allowing testimony that there was an ongoing criminal investigation in Barry County,

Michigan, regarding incidents of sexual abuse that may have occurred while Petitioner and the

victim lived in that county.  Petitioner argues that the evidence was irrelevant in this case and was

used only  to show his propensity to sexually abuse the victim.

The Michigan Court of Appeals found that the evidence was properly admitted,

stating:

> Plaintiff offered the evidence to prove defendant's plan or scheme in committing
> criminal sexual acts against the victim. Thus, the evidence was offered for a proper
> purpose under MRE 404(b)(1). A proper purpose is a purpose other than one that
> establishes the defendant's character in order to show his propensity to commit the
> offense. *VanderVliet, supra* at 62-64. Moreover, the evidence was relevant to a
> determination of an issue of fact of consequence at trial. *VanderVliet, supra* at 74.
> Evidence that is essential to provide the jury with an intelligible presentation of the
> full context in which disputed events occurred is admissible even if it implicates
> defendant in other crimes or wrongs. *People v Sholl*, 453 Mich 730, 741; 556 NW2d
> 851 (1996). Furthermore, the trial court instructed the jury as follows:
>
>> In this matter, you have heard evidence that was introduced to show
>> that the defendant has engaged in improper sexual conduct for which

he is not on trial. If you believe this other evidence, you must be very careful to consider it for only one limited purpose; that is, to help you judge the believability of testimony regarding the acts for which defendant is now on trial. You must not consider this evidence for any other purpose. For example, you must not decide that it shows the defendant is a bad person or that the defendant is likely to commit crimes. You must not convict the defendant here because you think he is guilty of other bad conduct.

This instruction limited any unfair prejudice stemming from the admission of the evidence. Thus, defendant failed to establish that the trial court abused its discretion in admitting the evidence.

(MCOA Op. 5-6.)

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle*, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." 502 U.S. at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Petitioner was not denied a fundamentally fair trial by the admission of evidence regarding past incidents of alleged sexual abuse in Arkansas and Barry County. As discussed by the Michigan Court of Appeals, the evidence was admissible under Michigan law to show

Petitioner's plan or scheme in committing sexual acts against the victim. Furthermore, the trial court gave the jury a limiting instruction to minimize the danger of unfair prejudice. Petitioner, therefore, cannot establish a violation of his due process rights.

    2. <u>Instruction to jury to disregard witness' testimony that she found condoms in the victim's purse</u>

Next, Petitioner claims that the trial court erred when it instructed the jury to disregard Jennifer Derby's testimony that she saw condoms in Nichole's purse. (Tr. II, 142.) The prosecutor objected to the testimony. The trial court held a brief bench conference with both counsel and then instructed the jury to disregard Derby's statement regarding the contents of Nichole's purse. (Tr. II, 143.) The trial court later explained on the record that Derby's testimony regarding the condoms was excluded out of concern that it could violate the Rape Shield law. (Tr. II, 154-55.) Petitioner claims that the evidence did not violate the Rape Shield law because it was not direct evidence of Nichole's sexual conduct or reputation. He further argues that the testimony was relevant to rebut Nichole's testimony that she did not have a normal life, i.e., her testimony that she stayed in her room, did not date, did not want to be alone with boys, etc. The Michigan Court of Appeals found that the issue was waived because defense counsel agreed that the trial court should instruct the jury to disregard the testimony.

As previously discussed, evidentiary rulings cannot rise to the level of due process violations unless they result in the denial of a fundamentally fair trial. *Seymour*, 224 F.3d at 552. Derby's testimony that she saw condoms in Nichole's purse was not crucial evidence for the defense. Petitioner presented other evidence to rebut the victim's assertions that she did not lead a normal life. Several defense witnesses, including Derby, testified at length that Nichole was a typical teenager who dated boys and had a normal relationship with her father. Moreover, while

there was no testimony about condom use between the victim and Petitioner, the jury could have

inferred that Nichole possessed the condoms in an effort to protect herself from becoming pregnant

during sexual contact with Petitioner. Consequently, the trial court's ruling did not violate

Petitioner's due process rights.

3. Admission of CPS worker's "expert" testimony regarding the victim's truthfulness

Petitioner also claims that the trial court erred by allowing CPS Worker Crystal

Burnett to give her expert opinion regarding the victim's credibility. Burnett testified at trial as a

lay witness, not as an expert witness. During re-direct examination of Burnett, the prosecutor asked:

> Now, the fact that Nichole Green, based on your experience, whether it be in
> Minnesota, working with The Dwelling House, working with families and then
> working here at CPS, the fact that Nichole has managed to be strong and not let this
> destroy her life, or, you know, completely destroy her life, does that in any way
> affect her -- the disclosure she made to you and her credibility, in your eyes?

(Tr. II, 92.) Defense counsel objected on the ground that the prosecutor was asking for an expert

opinion. (Tr. II, 92.) The trial court allowed Burnett to give an opinion as a lay witness pursuant

to M.R.E. 701. (Tr. II, 93.) In response to the prosecutor's question, Burnett stated:

> In my experience as a CPS worker and in prior experience, generally victims of any
> kind of violence, but especially sexual abuse, primarily fall into two general areas.
> One would be a victim mentality where everything from that point on that happens
> to them or that they allow to happen is outside of their control, and basically their life
> tends to fall apart. The other group, per se, which is a very small group, are the ones
> that drive forward even stronger and even harder because of what's happened to
> them, to the point where Nichole did make a comment to me that she is not going to
> let this bring her down, and that, if nothing else, this has made her a stronger person
> for the rest of her life.

(Tr. II, 93.)

The Michigan Court of Appeals found that the trial court did not abuse its discretion by allowing admission of Burnett's testimony. The court further held that any error in the admission of the evidence was harmless in light of the other evidence admitted at trial. The Court stated:

> Although it is not proper for one witness to comment on the credibility of another witness, *People v Dobek*, 274 Mich App 58, 71; ____ NW2d ____ (2007), we do not find that defendant's substantial rights were affected by the admission of the CPS worker's testimony. First, because the CPS worker was testifying based on her knowledge, experience, and training, "it would appear that [her] testimony constituted expert opinion testimony and not lay opinion testimony under MRE 701." *Id.* at 77. In child sexual abuse cases, "(1) an expert may not testify that the sexual abuse occurred, (2) an expert may not vouch for the veracity of a victim, and (3) an expert may not testify whether the defendant is guilty." *People v Peterson*, 450 Mich 349, 352; 537 NW2d 857 (1995). However, "an expert may testify with regard to the consistencies between the behavior of the particular victim and other victims of child sexual abuse to rebut an attack on the victim's credibility." *Id.* at 352-353. Here, the CPS worker testified regarding the consistencies between the victim's behavior and the behavior of other victims of sexual abuse to rebut what the prosecutor and the trial court perceived as an attack on the victim's credibility. Thus, the trial court did not abuse its discretion in admitting the testimony. *Dobek, supra*. Moreover, in light of the other evidence introduced at trial, any error in the admission of the testimony was harmless as we believe that it "did not tip the scales in favor of a guilty verdict." *People v Smith*, 456 Mich 543, 555 n 5; 581 NW2d 654 (1998).

(MCOA Op. 6.)

As previously stated, evidentiary rulings cannot rise to the level of due process violations unless they result in the denial of a fundamentally fair trial. *Seymour*, 224 F.3d at 552. While the prosecutor asked Burnett's opinion of Nichole's credibility, Burnett's response was limited to how Nichole's behavior compared with other victim's of child sexual abuse, which is permitted under Michigan law. Even assuming that the trial court erred by allowing Burnett to respond to the prosecutor's question, Burnett's testimony was not sufficiently prejudicial to deprive Petitioner of a fundamentally fair trial.

4. <u>Failure to hold separate trials on each of the charged offenses and require more specificity in the information and testimony regarding when the alleged offenses occurred</u>

Petitioner contends that the trial court denied him a fair trial by failing to hold separate trials on each offense and failing to require more specificity regarding the dates of the offenses. In Parts A and B of the Discussion, I concluded that Petitioner was not prejudiced by the manner in which he was charged or by the fact that he had one trial for all of the charged offenses. For the reasons previously stated, Petitioner's claim must be denied.

5. <u>Failure to curb prosecutorial misconduct</u>

Petitioner also contends that the trial court erred by failing to control the prosecutor and prevent him from engaging in misconduct. In Part E below, I find that the prosecutor did not engage in misconduct during Petitioner's trial. Consequently, Petitioner's claim is without merit.

6. <u>Improperly sentenced Petitioner on CSC II convictions</u>

Petitioner contends that the trial court erred by sentencing him to 10 to 15 years for his CSC II convictions. Petitioner's sentencing claims are addressed below in Part F.

7. <u>Erred in denying Petitioner's motion for new trial and/or resentencing</u>

Finally, Petitioner contends that the trial court erred by denying his motion for a new trial and/or re-sentencing, which raised the same claims presented in Petitioner's appeal and now in his habeas corpus petition. Because each of those claims is considered and rejected in this report and recommendation, Petitioner's claim is without merit.

E. **Ground VI: Prosecutorial Misconduct**

In his sixth ground for habeas corpus relief, Petitioner asserts several instances of prosecutorial misconduct. In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct

"'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"

*Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  In order to deny due process, the misconduct must be "'so pronounced and persistent that it permeates the entire atmosphere of the trial' or 'so gross as probably to prejudice the defendant.'"  *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997).  In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental.  *See United States v. Young*, 470 U.S. 1, 11-12 (1985).  The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court.  *See id.* at 12-13 (1985);  *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

      1.      <u>Improperly elicited testimony regarding an altercation that occurred between the victim's former boyfriend and one of the victim's brothers</u>

Petitioner claims that the prosecutor engaged in misconduct when he elicited testimony on cross-examination of Amanda Green regarding an incident that occurred at a Meijer store where Jackson Leo worked.  The alleged incident occurred after Nichole had accused her father of sexual abuse.  The following exchange occurred:

Q:    Were you aware that there are allegations that your husband [Woodrow Green] appeared - - again, the man with the blue shirt, correct?

A:    Correct.

Q:    -- He appeared at Jackson Leo's place of employment and --

A:    I was with him.

| Q: | Okay, there was an allegation that one of the younger kids had spit at Mr. Jackson -- or Mr. Leo? |
|----|----|
| A: | I've heard that Nichole had said that, yes. |
| Q: | Would it be safe to say that -- well, Nichole wasn't there, either, was she? |
| A: | Yes, she was. |
| Q: | She was there at the Meijer Store? |
| A: | Correct. |
| Q: | Was Mr. Leo working? |
| A: | Um, he was working when we first got there, yes. |
| Q: | Okay. Would it be safe to say that Nichole's disclosure of what her father had done has caused a number of people, her sisters, her brothers, to be upset with her? |
| A: | Correct. |

(Tr. II, 125-26.)

Petitioner contends the incident was irrelevant because it did not have anything to do with Petitioner or the victim, but he seems to argue that he was prejudiced by the testimony because the jury would assume that Petitioner was somehow involved. The Michigan Court of Appeals found that "[Petitioner] failed to assert how he was prejudiced by this testimony, which did not implicate him in any way. 'Error warranting reversal does not occur where a defendant fails to articulate how he was harmed.' *People v Ackerman*, 257 Mich App 434, 450; 669 NW2d 818 (2003)." (MCOA Op. 7.) Petitioner clearly was not prejudiced by the testimony the prosecutor elicited regarding the incident in the Meijer store. The prosecutor's line of questioning was intended to show that Nichole's family members were upset about her accusations against Petitioner, which is relevant to their credibility as witnesses in this case. Moreover, Petitioner's name was not

mentioned in connection with the incident and the jury would have no reason to believe that he was involved.

        2.      <u>Introduction of evidence and examination concerning Arkansas incident</u>

Petitioner asserts that the prosecutor engaged in misconduct by introducing evidence that he sexually abused Nichole in Arkansas, particularly by bringing in his statement from the CPS report that he was masturbating in Nichole's bedroom and landed on top of her after falling over a chair. Petitioner also claims that the prosecutor improperly asked defense witnesses if they were aware of the statement Petitioner made in Arkansas. In rejecting Petitioner's claim, the Michigan Court of Appeals stated:

> Defendant also contends that the prosecutor improperly asked defendant's witnesses whether they were aware of the statement that defendant made regarding the Arkansas incident. "The prosecutor's good-faith effort to admit evidence does not constitute misconduct." *Id.* at 448. No basis exists to conclude that the prosecutor offered the evidence in bad faith. The evidence regarding the Arkansas incident was admissible under MRE 404(b), and the trial court instructed the jury regarding the proper use of the evidence. Had defendant objected to the admission of the evidence at trial, the trial court could have given a further cautionary instruction. *See People v Lee*, 212 Mich App 228, 246; 537 NW2d 233 (1995).

(MCOA Op. 7.)

Petitioner was not denied a fair trial as a result of the prosecutor's introduction of evidence and examination regarding the incident in Arkansas. As discussed in Part D(1) above, evidence regarding the Arkansas incident was admissible under Michigan law to show Petitioner's plan or scheme in committing sexual acts against the victim. In addition, the trial court gave the jury a limiting instruction to minimize the danger of unfair prejudice.

3.      Misstatements of law

Petitioner contends that the prosecutor misstated the law and denigrated the trial concepts of credibility and reasonable doubt when he compared assessing the credibility of other people in their jobs and day-to-day lives to assessing the credibility of witnesses at trial. He further claims that the prosecutor misstated the law and attempted to put the prestige of his office behind the victim's case when he said that he represented not only the victims of crime, but the people of the State of Michigan. (Tr. I, 96.) In addition, Petitioner claims that the prosecutor misstated the law when, in closing arguments, he asked for a verdict "on behalf of Nichole and the People of the State of Michigan." (Tr. II, 182.)

The Michigan Court of Appeals found no misconduct by the prosecutor and that any erroneous legal arguments made by the prosecutor were cured by the trial courts instructions to the jury. (MCOA Op. 7.) I agree that there was nothing improper about the prosecutor's comments regarding credibility. The prosecutor simply was trying to help the jury understand the concept of credibility by relating it to the jurors' every day lives. Likewise, the prosecutor's statements that he represented the victim and the State of Michigan was a true statement, and, thus, did not constitute misconduct. Moreover, the trial court provided the final instructions to the jury, which included instructions regarding credibility and reasonable doubt. The trial court also instructed the jurors that they must decide the facts, and that the statements of counsel were not evidence. Petitioner, therefore, cannot show that he was prejudiced by the prosecutor's alleged misstatements of the law.

4.      Improper arguments

Petitioner contends that the prosecutor improperly vouched for the victim's credibility, asked the jury to render a verdict out of sympathy for the victim, and asserted a civic duty argument. Petitioner references the following portions of the prosecutor's closing arguments:

What has Nichole Green gained by coming forward here?  What has she gained?  The better thing is what has she lost?  This is a girl who, by the testimony you have in front of you, her mother abandons her, leaves her with this man (indicating).  We know that this man violates the very trust that any parent and daughter have, that he gets caught doing it down in Arkansas.  And what does that system do?  Well, I submit to you it fails her, because they put her right back in his hands after eight months.  So her mother abandons her.  Her father abuses her.  The Arkansas officials really drop the ball.

And what do we find out now that she had come forward here?  What has she gained, or better yet, what has she lost?  The only thing she has left are her brothers and sisters, and they clearly have lined up against her.  She has lost them.  In sum, she has lost everything.  And yet we know from her testimony, we know from Detective Adams' testimony, and we know from Ms. Burnett's testimony that not once has she wavered about what her father has done to her.  Not once, Despite losing all of this, she is here before you.

***

[Y]ou heard the instruction just a moment ago that the testimony of the victim need not be corroborated.  I want to make it clear, I can't vouch for my witness, I can't sit up here and say, geez, she is a great person and a great kid, you should believe her.  The facts have to support that.  But I can tell you this:  If all the evidence I had was Nichole Marie Green, I would still be standing up in front of you advocating, and that instruction really bears on this case, because I submit to you her testimony alone is credible and is enough based on the elements the Judge gave you to convict the defendant.

(Tr. II, 174-76.)

The Michigan Court of Appeals concluded that the prosecutor's arguments were not improper in the context of the evidence presented at trial:

Defendant also contends that, in his closing argument, the prosecutor improperly vouched for the victim's credibility, asked the jury to render a verdict out of sympathy for the victim, and asserted a civic duty argument. A prosecutor may not appeal to the jury to sympathize with the victim, *People v Abraham*, 256 Mich App 265, 273; 662 NW2d 836 (2003), or to convict on the basis of their civic duty, *Ackerman, supra* at 452. But we must evaluate the prosecutor's remarks in light of the relationship or lack of relationship they bear to the evidence admitted at trial. *Id.* Viewed in context, the prosecutor's closing argument did not rise to the level of an appeal to juror sympathy or to the level of an improper civic duty argument. Moreover, the trial court instructing the jury that it had to decide the case on the evidence and that the attorneys' arguments were not evidence was sufficient to

eliminate any prejudice that might have resulted from the prosecutor's comments. *See Abraham, supra* at 276; *Grayer, supra* at 357.

Additionally, a prosecutor may not vouch for the credibility of witnesses by claiming some special knowledge with respect to their truthfulness. "But a prosecutor may comment on his own witnesses' credibility during closing argument, especially when there is conflicting evidence and the question of the defendant's guilt depends on which witnesses the jury believes." *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004). Considering the prosecutor's challenged closing remarks in context, it is apparent the prosecutor was not implying that he had some special knowledge of the victim's truthfulness. Throughout his closing argument, the prosecutor argued to the jury that the evidence in the case proved beyond a reasonable doubt that defendant was guilty of the charged offenses. His challenged argument was based on the evidence presented in the case and the reasonable inferences arising from the evidence. Thus, his argument was proper. "A prosecutor may not make a statement of fact to the jury that is unsupported by the evidence, but she is free to argue the evidence and any reasonable inferences that may arise from the evidence." *Ackerman, supra* at 450.

(MCOA Op. 7-8.)

The prosecutor's comments were not so inflammatory as to constitute a denial of due process. The cases in which the Sixth Circuit has found prejudicial misconduct have involved much more egregious and pervasive attempts to evoke sympathy. For example, in *Martin v. Parker*, 11 F.3d 613 (6th Cir. 1993), the Court of Appeals condemned the prosecutor's repeated references to the defendant as a "Hitler," a "dictator," a "disturbed individual," and "one of the most obnoxious witnesses you'll ever hear." *Martin*, 11 F.3d at 616; *accord United States v. Steinkoetter*, 633 F.2d 719, 720-21 (6th Cir. 1980) (prosecutor's comparison of defendant to Pontius Pilate and Judas Iscariot require reversal). By contrast, the prosecutor's remarks in the present case were not directed toward Petitioner and were not inflammatory. Rather, the prosecutor wanted to remind the jury that Nichole had nothing to gain by making the accusations against her father. As the Sixth Circuit has observed, it is impossible to expect that a criminal trial will be conducted without some showing of feeling. "'The stakes are high, and the participants are inevitably charged with emotion.'" *Sizemore*

*v. Fletcher*, 921 F.2d 667, 670 (6th Cir. 1990) (quoting *United States v. Wexler*, 79 F.2d 526, 529-30 (2d Cir. 1935)).

Likewise, the prosecution's did not improperly bolster the victim's credibility. Given the lack of physical evidence, this case essentially was a credibility contest between Petitioner and Nichole. The prosecutor presented evidence that Nichole's family members turned against her after she made the allegations in order to show that she did not have a motive for lying about what had occurred. It is appropriate for the prosecutor to invite the jury to examine the testimony they have heard at trial, draw reasonable inferences, and examine the motives witnesses may have for lying. *See Cantrell v. Gray*, No. 84-3686, 1986 WL 16540, at *3 (6th Cir. Feb. 7, 1986); *see also United States v. Eltayib*, 88 F.3d 157, 173 (2d Cir. 1996); *Rodriguez v. Peters*, 63 F.3d 546, 564 (7th Cir. 1995). Moreover, instructing a jury that the arguments are not evidence has sometimes been deemed to cure any improprieties in a closing argument. *Byrd v. Collins*, 209 F.3d at 486, 538 (6th Cir. 2000). Further, instructing the jury regarding the methods it should use to evaluate credibility helps to cure any improprieties. *Id.* In this action, the court gave both instructions. (*See* Tr. IV, 93-97.)

Furthermore, Petitioner did not make an improper civic duty argument. An improper "civic duty" argument is one which "encourages the jury to convict the defendant based upon principles of protection of the community and encourages them to ignore the evidence in the case." *United States v. Mejorado-Soto*, No. 94-2404, 1995 WL 764115, at *2 (6th Cir. Dec.27, 1995) (per curiam). Here, the prosecutor did neither of these things. While the prosecutor suggested that "the system" had failed Nichole, he did not go so far as to ask the jury to convict Petitioner to protect Nichole or the community. In fact, Nichole no longer required protection because she was an adult and no longer in Petitioner's custody. Moreover, the prosecutor did not invite the jury to ignore

evidence. Consequently, the decision of the Michigan Court of Appeals was not an unreasonable application of clearly established Supreme Court precedent.

### 5. Cumulative error

Finally, Petitioner asserts that the prosecutor's improper actions created reversible error, when they are considered cumulatively. Under the AEDPA, a court only may grant habeas relief based on a misapplication of Supreme Court law. *Bailey*, 271 F.3d at 655. The Sixth Circuit repeatedly has stated that cumulative error claims are not cognizable on habeas review. "The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief." *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002); *see also Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006); *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006); *Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004); *Millender v. Adams,* 376 F.3d 520, 529 (6th Cir. 2004); *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir. 2002). Finally, because the individual claims are without merit, Petitioner cannot show that the cumulative error violated his constitutional rights. *See Seymour*, 224 F.3d at 557.

### 6. Ineffective assistance of counsel

Petitioner also maintains that his trial counsel was ineffective for failing to object to some of the prosecutor's remarks raised above in this section. To satisfy the prejudice prong of the *Strickland* test, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The prejudice prong "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). I concluded above that Petitioner was not

denied a fundamentally fair trial as a result of the prosecutor's alleged misconduct; therefore, he cannot show prejudice as required by *Strickland*. When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'" *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697. Petitioner cannot establish prejudice; therefore, his claim of ineffective assistance of counsel must fail.

### F.     Grounds VII and VIII: Sentencing Issues

In Ground VII, Petitioner claims that his due process rights were violated when the trial court sentenced him on the basis of inaccurate information. Specifically, Petitioner contends that the trial court misscored Offense Variable (OV) 8 and OV 11, which resulted in an inflated guideline range. He also claims that he was sentenced in violation of *Blakely v. Washington*, 542 U.S. 296 (2004). In his eighth ground for habeas relief, Petitioner further claims that he is entitled to re-sentencing under the corrected sentencing guidelines. Petitioner further claimed in Ground IX that his trial counsel was ineffective during the sentencing phase of the proceedings.

#### 1.     Sentence scoring

Claims concerning the improper scoring of sentencing guidelines are state-law claims and typically are not cognizable in habeas corpus proceedings. *See Hutto v. Davis*, 454 U.S. 370, 373-74 (1982) (federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature); *Austin v. Jackson*, 213 F.3d 298, 301-02 (6th Cir. 2000) (alleged violation of state law with respect to sentencing is not subject to federal habeas relief); *Cheatham v. Hosey*, No. 93-1319, 1993 WL 478854, at *2 (6th Cir. Nov. 19, 1993)

(departure from sentencing guidelines is an issue of state law, and, thus, not cognizable in federal habeas review); *Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (the sentencing guidelines establish only rules of state law). There is no constitutional right to individualized sentencing. *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995). Moreover, a criminal defendant has "no federal constitutional right to be sentenced within Michigan's guideline minimum sentence recommendations." *Doyle v. Scutt*, 347 F. Supp. 2d 474, 485 (E.D. Mich. 2004); *accord Lovely v. Jackson*, 337 F. Supp. 2d 969, 977 (E.D. Mich. 2004); *Thomas v. Foltz*, 654 F. Supp. 105, 106-07 (E.D. Mich. 1987).

Although state law errors generally are not reviewable in a federal habeas proceeding, an alleged violation of state law "could, potentially, 'be sufficiently egregious to amount to a denial of equal protection or of due process of law guaranteed by the Fourteenth Amendment.'" *Koras v. Robinson,* 123 F. App'x 207, 213 (6th Cir. Feb. 15, 2005) (citing *Bowling v. Parker*, 344 F.3d 487, 521 (6th Cir. 2003)). *See also Doyle*, 347 F. Supp. 2d at 485 (a habeas court "will not set aside, on allegations of unfairness or an abuse of discretion, terms of a sentence that is within state statutory limits unless the sentence is so disproportionate to the crime as to be completely arbitrary and shocking.") (citation omitted). A sentence may violate due process if it is based upon material "misinformation of constitutional magnitude." *Koras,* 123 F. App'x at 213 (quoting *Roberts v. United States,* 445 U.S. 552, 556 (1980)); *see also United States v. Tucker,* 404 U.S. 443, 447 (1972)*; Townsend v. Burke,* 334 U.S. 736, 741 (1948). To prevail on such a claim, the petitioner must show (1) that the information before the sentencing court was materially false, and (2) that the court relied on the false information in imposing the sentence. *Tucker*, 404 U.S. at 447;*United States v. Polselli*, 747 F.2d 356, 358 (6th Cir. 1984). *Koras,* 123 F. App'x at 213 (quoting *United States v. Stevens,* 851 F.2d 140, 143 (6th Cir. 1988)). A sentencing court demonstrates actual

reliance on misinformation when the court gives "explicit attention" to it, "found[s]" its sentence "at least in part" on it, or gives "specific consideration" to the information before imposing sentence. *Tucker*, 404 U.S. at 444, 447.

The Michigan Court of Appeals found that the trial court properly scored OV 8, but improperly scored OVs 11 and 13. The Court explained:

> In calculating a sentencing guidelines range, a court must assess fifteen points under OV 8 if the "victim was asported to another place of greater danger or to a situation of greater danger . . . ." MCL 777.38(1)(a). In this case, the victim testified that sexual acts occurred in defendant's car because there were too many people living in their home. On one occasion, defendant drove her to a parking lot, at night, where sexual acts occurred. "[I]n light of the sexual acts that subsequently occurred there, the transportation of the victim was to a place of greater danger." *Cox, supra* at 454. Further, trial testimony supported the conclusion that "the crimes could not have occurred as they did without the movement of defendant and the victim[ ] to a location where they were secreted from observation by others." *People v Spanke*, 254 Mich App 642, 648; 658 NW2d 504 (2003). Thus, the trial court did not abuse its discretion in scoring 15 points under OV 8. *See People v Phillips*, 251 Mich App 100, 108; 649 NW2d 407 (2002).

> In calculating a sentencing guidelines range, a court must score 50 points under OV 11 if "[t]wo or more criminal sexual penetrations occurred." MCL 777.41(1)(a). In this case, defendant was convicted of two counts of CSC-I, each based on a separate sexual penetration of the victim. The trial court was precluded from scoring points under OV 11 for the one penetration that formed the basis of each CSC-I offense. MCL 777.41(2)(c); *Cox, supra* at 456. And, there was no evidence that more than one penetration occurred during any one incident underlying defendant's CSC-I convictions. *Cf. People v Matuszak*, 263 Mich App 42, 61; 687 NW2d 342 (2004). Further, no evidence established that the penetrations that formed the bases for defendant's CSC-I convictions arose out of each other. *See People v Johnson*, 474 Mich 96, 102; 712 NW2d 703 (2006) ("[t]here is no evidence that the penetrations resulted or sprang from each other or that there is more than an incidental connection between the two penetrations"). Thus, the evidence in this case did not support the scoring of any points under OV 11.

> Criminal sexual penetrations extending beyond the sentencing offense may be scored under OV 12 (contemporaneous felonious criminal acts that occurred within 24 hours of the sentencing offense and that have not and will not result in separate convictions), MCL 777.42, or OV 13 (continuing pattern of criminal behavior), MCL 777.43. *Johnson, supra* at 102 n 3. There was insufficient evidence from which to conclude that any of the criminal sexual penetrations occurred within 24 hours of

each other. Thus, OV 12 did not apply in this case. Id. But, the trial court should have scored the criminal sexual penetrations under OV 13.

In calculating a sentencing guidelines range, a court must score 25 points under OV 13 if the "offense was part of a pattern of felonious criminal activity involving 3 or more crimes against a person." MCL 777.43(1)(b). In scoring OV 13, "all crimes within a 5-year period, including the sentencing offense, shall be counted regardless of whether the offense resulted in a conviction." MCL 777.43(2)(a) (emphasis added). Defendant's concurrent convictions for CSC-I and CSC-II, in addition to the evidence from which the trial court could reasonably have concluded that defendant committed additional felonious criminal sexual acts against the victim within a 5-year period, would have supported the scoring of 25 points under OV 13 in this case. "Because defendant's sentences are predicated upon an inaccurate calculation of the guidelines range, defendant is entitled to be resentenced." *Johnson, supra* at 103. *See also People v Francisco*, 474 Mich 82, 89-91; 711 NW2d 44 (2006).

(MCOA Op. 8-9).

With regard to OV 8, the Michigan Court of Appeals found that the trial record adequately supported a score of 15 points for transporting the victim to a place of greater danger based upon the victim's testimony that Petitioner drove her to various locations away from their home and engaged her sexual acts in the car. However, the court of appeals agreed that the trial court erred in scoring OV 11, which resulted in an inaccurate calculation of the guidelines range. Consequently, the court of appeals remanded Petitioner's case for re-sentencing. After re-sentencing, Petitioner's sentences for the first-degree CSC convictions were reduced from fifteen to fifty years to ten to fifty years. The sentences for the second-degree CSC convictions remained unchanged at ten to fifteen years.

Petitioner does not allege or show that the trial court relied on the false information in imposing the new sentences. While Petitioner disputes the trial court's scoring of OV 8, he does not argue that the facts found by the trial court at sentencing were either materially false or based on false information. *Tucker*, 404 U.S. at 447. Instead, Petitioner argues only that the court's sentencing findings were not sufficiently supported by the record. Such claims clearly fall far short

of the sort of egregious circumstances implicating due process. Thus, the Michigan Court of Appeals' rejection of Petitioner's claim was not based on an unreasonable determination of the facts and was neither contrary to nor an unreasonable application of established Supreme Court precedent. 28 U.S.C. § 2254(d).

2.    *Blakely v. Washington*

Petitioner also claims that he was sentenced in violation of *Blakely v. Washington*, 542 U.S. 296 (2004). *Blakely* concerned the State of Washington's determinate sentencing system, which allowed a trial judge to elevate the maximum sentence permitted by law on the basis of facts not found by the jury but by the judge. Applying the Washington mandatory sentencing guidelines, the trial judge found facts that increased the maximum sentence faced by the defendant. The Supreme Court found that this scheme offended the Sixth Amendment, because any fact that increases or enhances a penalty for the crime beyond the prescribed statutory maximum for the offense must be submitted to the jury and proven beyond a reasonable doubt. *Blakely,* 542 U.S. at 301 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Unlike the State of Washington's determinate sentencing system, the State of Michigan has an indeterminate sentencing system in which the defendant is given a sentence with a minimum and a maximum term. The maximum sentence is not determined by the trial judge, but is set by law. *See People v. Drohan,* 715 N.W.2d 778, 789-92 (Mich. 2006) (citing MICH. COMP. LAWS § 769.8). Only the minimum sentence is based on the applicable sentencing guideline range. *Id.; and see People v. Babcock*, 666 N.W.2d 231, 237 n.7 (Mich. 2003) (citing MICH. COMP. LAWS § 769.34(2)). Therefore, under Michigan law, the trial judge sets the minimum sentence (within a certain range), but can never exceed the maximum sentence. *Drohan,* 715 N.W.2d at 789.

Because the trial court can never exceed the maximum sentence set by statute, Michigan's indeterminate sentencing scheme, unlike the determinate sentencing scheme at issue in *Blakely*, does not infringe on the province of the finder of fact, and, thus, does not run afoul of *Blakely*. *See Blakely,* 542 U.S. at 304-05, 308-09. Because the trial court in the present case sentenced Petitioner well within the parameters of Michigan's indeterminate sentencing scheme, it did not violate his Sixth Amendment rights. *See Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007) (affirming district court's dismissal of prisoner's claim under *Blakely v. Washington* because it does not apply to Michigan's indeterminate sentencing scheme); *see also Gray v. Bell*, No. 1:06-cv-611, 2007 WL 172519, at *3 (W.D. Mich. Jan. 19, 2007); *Pettiway v. Palmer,* No. 1:06-cv-132, 2006 WL 1430062, at *1 (W.D. Mich. May 23, 2006); *Stanley v. Jones,* No. 1:06-cv-49, 2006 WL 1459832, at *2 (W.D. Mich. May 23, 2006); *Jones v. Trombley*, No. 2:07-cv-10139, 2007 WL 405835, at *3 (E.D. Mich. Jan. 31, 2007); *Mays v. Trombley*, No. 2:06-cv-14043, 2006 WL 3104656, at *3 (E.D. Mich. Oct. 31, 2006); *Worley v. Palmer,* No. 2:06-cv-13467, 2006 WL 2347615, *2 (E.D. Mich. Aug. 11, 2006); *George v. Burt*, No. 2:04-cv-74968, 2006 WL 156396, at *5 (E.D. Mich. Jan. 20, 2006); *Walton v. McKee*, No. 2:04-cv-73695, 2005 WL 1343060, at *3 (E.D. Mich. June 1, 2005).

### 3. Re-sentencing

Petitioner has failed to establish any constitutional error arising from his sentence. Thus, his eighth ground for habeas corpus relief seeking re-sentencing must be denied.

### 4. Ineffective assistance of counsel

In his ninth ground for habeas corpus relief, Petitioner also claims that his trial counsel was ineffective during the sentencing phase when she did not object to inaccuracies in the scoring of OVs 8 and 11. He further claims that counsel made an inadequate allocution before the

trial court, merely stating that Petitioner maintained his innocence.  The Michigan Court of Appeals

rejected Petitioner's claims, stating:

> Defendant also contends that defense counsel was ineffective for failing to object to
> the scoring of OV 8 and OV 11 at the sentencing hearing. However, defense counsel
> objected to the trial court's scoring of OV 8 and OV 11 in the motion for
> resentencing. Thus, defendant cannot establish that  he was prejudiced by defense
> counsel's failure to object to the scoring of the sentencing guidelines at the initial
> sentencing hearing.
>
> Further, defense counsel was not ineffective for failing to request a sentence near the
> middle of the sentencing guidelines range. At the sentencing hearing, defense
> counsel asserted that defendant maintained his innocence in this case, but he made
> no recommendation regarding defendant's sentence. "The decision to address the
> court at sentencing is a tactical one." *People v Arney*, 138 Mich App 764, 766; 360
> NW2d 291 (1984). Defendant cannot show "that counsel's performance fell below
> an objective standard of reasonableness and that, but for defense counsel's errors,
> there was a reasonable probability that the result of the proceeding would have been
> different." *Ackerman, supra* at 454.

(MCOA Op. 10.)

The decision of the Michigan Court of Appeals was not an unreasonable application

of  *Strickland*.  As discussed by the court of appeals, trial counsel challenged the scoring of OVs 8

and 11 in Petitioner's motion for re-sentencing.   While that motion was denied, Petitioner

successfully appealed the scoring of OV 11 and after re-sentencing, his minimum sentence for his

two CSC convictions was reduced from fifteen years to ten years.  Furthermore, Petitioner cannot

show that he was prejudiced by trial counsel's lack of allocution at sentencing.  While Petitioner

contends that counsel should have made further argument in his favor, he does not specifically allege

what counsel could have said to the trial court that would have resulted in a lower sentence.

Petitioner, therefore, is not entitled to habeas corpus relief based upon ineffective assistance of

counsel.

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Dated:  December 1, 2009                              /s/ Hugh W. Brenneman, Jr.
                                                      HUGH W. BRENNEMAN, JR.
                                                      United States Magistrate Judge


**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).